Sanders, Janet L., J.
This action arises in the aftermath of the criminal conduct of Bernard Madoff, who in December 2008 admitted to operating the largest Ponzi scheme in United States history. The plaintiffs allege the loss of millions of dollars they invested in two Madoff “feeder funds,” hedge funds whose assets were invested almost exclusively with Madoff and his investment advisory firm. The plaintiffs’ Second Amended Complaint (the Complaint) asserts twenty-three counts variously against the two hedge funds; the corporate general partner of both funds; the corporate parent, grandparent, great-grandparent, and great-great-grandparent of the general partner; and the independent auditor of the funds. The Complaint alleges claims for fraudulent securities transactions under the laws of several states, fraud in the inducement, negligent misrepresentation, breach of fiduciary duty, violation of G.L.c. 93A, §§9 and 11, aiding and abetting breach of ñduciaiy duty, aiding and abetting fraud, and professional malpractice. The plaintiffs seek unspecified damages, costs, fees, and other relief.
The action comes before this Court on four separate motions to dismiss; the funds’ auditor also moves in the alternative to compel arbitration of the claims against it. After careful review of all the materials submitted by the parties, this Court (1) Allows the motion filed by Oppenheimer Acquisition Corporation, (2) Allows the motion filed by Massachusetts Mutual Life Insurance Company and MassMutual Holding LLC, and (3) Allows in part and Denies in part each of the other three motions. The reasons for these rulings follow.
BACKGROUND
This Court begins by summarizing the allegations in the Complaint, reserving certain details for later discussion in connection with the issues raised.[3]
On December 11, 2008, the United States Department of Justice announced that Bernard L. Madoff, founder of investment advisory firm Bernard L. Madoff Investment Securities LLC (BLMIS) and former chairman of the NASDAQ stock market, had been arrested and charged with securities fraud. According to the Justice Department announcement, Madoff admitted that it was “all just one big lie” and that his investment advisory business was basically “a giant Ponzi scheme.” Rather than investing clients’ money in shares of common stock, options, and other securities as he had represented, Madoff used funds from new investors to pay the prior investors. In later pleading guilty to securities fraud violations and other federal crimes, Madoff acknowledged that since at least the early 1990s, he had not actually purchased any securities with his clients’ investments but instead had simply deposited the money into an account at Chase Manhattan Bank which he used to pay redemptions. To sustain his scheme, Madoff generated fraudulent client statements and other documents and main *342 tained his operations in secrecy, providing very little access to investors. Sources revealed that Madoff and his firm had more than $17 billion in assets under management as of the beginning of 2008. Madoff himself estimated that his fraud caused losses of approximately $50 billion.
The plaintiffs are twenty-seven individuals and entities that invested in one of two hedge funds: defendant Rye Select Broad Market Prime Fund, L.P. (Rye Prime Fund) and defendant Rye Select Broad Market XL Fund, L.P. (Rye XL Fund) (collectively with the Rye Select Broad Market Fund, L.P., the Rye Funds or the Funds). The Rye Funds served as Madoff “feeder funds”; nearly all the assets of each fund were invested with Madoff and BLMIS. One month after Madoffs arrest and the disclosure of his fraudulent scheme, the plaintiffs and other investors were informed that the Rye Funds had lost substantially all their value and that there appeared “no prospect for meaningful recovery of those assets."
Each of the Rye Funds was formed as a Delaware limited partnership in which defendant Tremont Partners, Inc. (Tremont Partners) was the general partner. Tremont Partners as general partner had the sole authority over the investments made by the Rye Funds and the selection of any investment advisor used by the Funds. Tremont Partners selected Madoff and BLMIS, using them as the Funds’ investment advisor, custodian, and broker/dealer.
Tremont Partners is an investment management firm with offices in Rye, New York. Its corporate parent, also located in Rye, is defendant Tremont Group Holdings, Inc. (Tremont Group Holdings) (collectively with Tremont Partners, Tremont). Tremont Partners is operated by Tremont Group Holdings through a division called Rye Investment Management. Although Tremont Partners as the general partner was responsible for the day-to-day administration and operation of each partnership, Tremont Group Holdings also used Rye Investment Management to manage the Rye Funds. In certain respects, Tremont Group Holdings treated Rye Investment Management and Tremont Partners as interchangeable. The plaintiffs allege that Tremont Partners and Tremont Group Holdings were collectively responsible for the solicitation, sale, operation, and management of the Rye Funds.
The plaintiffs began investing in the Rye Funds in 2006, almost all of them in consultation with their investment advisor, LongVue Advisors, LLC (LongVue). Many of the plaintiffs are residents of the Commonwealth of Massachusetts, and LongVue is a Massachusetts-based investment advisory firm. LongVue had been approached years before to discuss possible investments by the plaintiffs with Tremont. In 2006, Tremont solicited a meeting with LongVue at which Tremont specifically suggested to LongVue that its clients (including the plaintiffs), consider investing with Madoff and BLMIS via the Rye Funds.
To make this investment, each of LongVue’s clients was offered a limited partnership interest in the Rye Funds through a Confidential Private Placement Memorandum (PPM). The Rye Fund PPMs contained specific representations that led the plaintiffs to believe that: a) Tremont Partners, as general partner, carefully selected the investment advisor for each partnership using designated criteria; b) Tremont and the Rye Funds actively monitored the selected advisor, the advisor’s trading activity, and the securities in which the Funds invested; c) Tremont and the Funds regularly monitored fund assets through, among other means, producing audited financial statements for the limited partners; and d) the Rye XL Fund engaged in a diversified investment strategy. None of the PPMs for the Rye Funds disclosed that the majority of the Funds’ assets were invested with Madoff. Nor did the PPMs disclose that Madoff and BLMIS were fulfilling three roles generally filled by three separate companies: Madoff was the investment advisor, and BLMIS was both the custodian for the Rye Funds’ account and the broker/dealer for the trades that were purportedly made on the Funds’ behalf. Tremont and the Rye Funds knew that having related parties perform all three functions was a substantial material risk, but did not disclose that risk to the plaintiffs.
In making their initial investments, the plaintiffs also relied upon the most recent annual fact sheet for the fund in which they invested. Among other things, each fund’s fact sheet explained the “split-strike conversion” (or “split-strike synthetic conversion”) investment strategy which Madoff claimed to follow, and illustrated the particular fund’s purported historic performance. The fact sheets stated that the respective fund had experienced “years of consistent positive returns” and adhered to “defined risk and return parameters.” They further stated that Tremont Partners allocated the Funds’ investment portfolios to advisors with “conservative investment styles” who demonstrated over time and under all economic and market conditions the ability to achieve consistent returns. In addition to the fact sheets, each plaintiff received monthly capital account reports, relying on Tremont to provide accurate information. Those reports purported to show a significant and steady return on investment with low volatility.
Before LongVue recommended investing in the Rye Funds in 2006, representatives from LongVue met with representatives from Tremont, and LongVue conducted due diligence on Tremont and the Rye Funds. During those meetings, Tremont offered specific assurances about Madoff and BLMIS. For instance, when LongVue expressed skepticism regarding Madoffs consistently low volatility, Tremont stated that it “had access to [Madoff and BLMIS] that no one else had” and that Tremont received paper trade confirmations from Madoff by which it could confirm that his trades were real.[4] In responding to LongVue’s concern that Madoff “self-custodied" the Rye Funds’ *343 assets, Tremont represented that Madoff did not use an independent custodian because doing so would make the details of his proprietary investment strategy more widely known. When LongVue inquired why Madoff appeared to engage in the unusual practice of selling off his investments in order to report only a cash balance at the end of each quarter, Tremont represented that Madoff did so to protect his investments from quarter-and year-end volatility.
In addition to these assurances, Tremont furnished to LongVue documents and other materials, including a completed due diligence questionnaire. This questionnaire represented that Tremont had invested tens of millions of dollars in the Rye Funds, described Madoffs purported investment strategy, and stated that, although Madoff had full discretion over the trading of the Rye Prime Fund, Tremont Partners had reviewed each of the trades to ensure that Madoff did not deviate from the Fund’s stated investment strategy. Moreover, both before recommending that the plaintiffs invest in the Rye Funds and roughly every month thereafter, Tremont provided LongVue with detailed information regarding the Funds’ purported holdings and performance. Through multiple PowerPoint representations, marketing materials for the Rye Funds and on its own website, Tremont represented that it reviewed investment managers’ analytical processes and financial models, carefully scrutinized investments for risk allocation, and closely monitored individual managers by making quarterly calls and onsite visits.
The Rye Fund PPMs stated that the annual reports for the Funds were audited by an independent certified public accountant. Since 2004, defendant KPMG LLP (KPMG) served as the Funds’ auditor and performed annual audits of the plaintiffs’ investments. Specifically, KPMG audited the Rye Funds’ financial statements, schedules of investments, statements of operations, year-end cash flows, and changes in the limited partners’ capital accounts. Each annual report for the Rye Funds was addressed to “The Partners” of the respective fund, which included the plaintiffs. The reports stated that KPMG had performed its audits in accordance with generally accepted auditing principles, which required that KPMG be reasonably assured that financial statements were free of any material misstatement. The reports also stated that KPMG’s audits “include(d) examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by the General Partner, as well as evaluating the overall financial statement presentation.” KPMG expressed an unqualified opinion that each fund’s financial statements fairly presented the financial position of the fund at year’s end, the results of its operations, and its cash flows.
In addition to its audits, KPMG annually prepared individual Form K-1 tax statements for each plaintiff using information from its audits. Because the Rye Funds were “pass through” tax entities with no independently taxable income, the profits and losses of the Funds were allocated to the partners in accordance with the distributive share of each partner. The Rye Funds did not pay taxes on profits nor offset against losses allocated to the capital accounts. Rather, each individual partner paid taxes on the profits allocated to the partner’s particular capital account and could offset other taxable income with losses allocated to such capital account. The Form K-l statements reported yearly individual profits or losses to each partner, and the plaintiffs relied upon representations made by KPMG in the Form K-l statements in paying taxes on their capital accounts and in managing their investments. The Form K-l statements identified taxable income associated with each plaintiffs capital account, certifying to each plaintiff that real investment income was earned for each account. The plaintiffs allege that KPMG knew and intended that its audits and K-l tax statements would be provided to the plaintiffs, who subsequently relied upon them in making investment decisions and calculating individual tax liabilities.
In the days following Madoffs arrest in December 2008, the United States Securities and Exchange Commission (SEC or the Commission) initiated an investigation regarding Madoff going back to at least 1999. In a 457-page report released August 31, 2009 (the SEC Report), the SEC Office of Investigations catalogued the numerous “red flags” that could have led investment professionals and their auditors to uncover Madoffs fraud — and in fact did lead other feeder funds to decide not to invest with Madoff.[5] Those “red flags” included the implausibility of Madoffs years of consistently positive, low volatility returns that others in the industry could not replicate, as well as the atypical structure and operation of Madoffs business. As to the latter, the SEC and others in the financial world noted: (a) the lack of segregation among service providers, (b) the use of an obscure, unqualified auditor, (c) the use of an unusual fee structure that resulted in Madoff foregoing millions of dollars of fees, (d) the employment of numerous family members for key control positions, (e) Madoffs insistence on secrecy about his operations, (f) the insufficient staff he used given the reported amount of assets under management, (g) his failure to register with the SEC, (h) the use of outdated, unsophisticated customer account information; and (i) the location of BLMIS’s comptroller. The SEC Report noted that the Madoffs investment results were particularly difficult to analyze or explain through quantitative analysis.
Well before Madoffs revelations in 2008, several press articles raised questions about the legitimacy of his activities. These included the May 2001 article *344 appearing in MAR/Hedge, a semi-monthly newsletter that reported on the hedge fund industry and was widely read by hedge fund managers. In that article, author Michael Ocrant wrote that Madoff had reported consistently positive results for the last eleven years and that a number of industry experts had questioned the consistency of the results. Ocrant reported that Madoff refused to provide details on how the firm managed risk, saying, “I’m not interested in educating the world on our strategy . . . The strategy is the strategy and the returns are the returns.”
The instant action was commenced on December 10,2010. The complaint named as defendants the Rye Funds, Tremont Partners, Tremont Group Holdings, and KPMG, in addition to three upstream parent corporations of Tremont Group Holdings: defendants Oppenheimer Acquisition Corporation (Oppenheimer Acquisition), MassMutual Holding LLC (MassMutual Holding), and Massachusetts Mutual Life Insurance Company (MassMutual Life Insurance, or collectively with MassMutual Holding, MassMutual). Tremont Group Holdings is a wholly-owned subsidiary of Oppenheimer Acquisition, which itself is a subsidiary of MassMutual Holding, which in turn is'a subsidiary of MassMutual Life Insurance. The plaintiffs allege in conclusory fashion that, through Tremont, Oppenheimer Acquisition and MassMutual were involved in and had oversight of the solicitation, sale, operation and management of the Rye Funds.
Oppenheimer Acquisition — the parent of OppenheimerFunds, Inc. (OppenheimerFunds), acquired Tremont Group Holdings (then known as Trem-ont Advisers, Inc.) in 2001. At the time, Oppenheimer Acquisition and its parent corporations were interested in allowing their investors greater access to alternative investments, including hedge funds and funds of multiple hedge funds. As one of the early pioneers in the “fund of funds” sector, Tremont was an attractive target, and, according to the Complaint, Tremont’s access to Madoff was one of its most critical selling points. Tremont was also an attractive acquisition because of the revenue stream it generated through fees assessed on the investments made by investors in the Rye Funds. At the time it was approached, Tremont claimed to have been growing at a rate of thirty percent annually for three consecutive years — growth that Tremont attributed to investor fees. Tremont also stood to benefit from the proposed acquisition. Among other things, the deal promised to give Tremont the opportunity to market its products and services through MassMutual Financial Group’s extensive global distribution network and would allow Tremont to operate with the imprimatur of the familiar and well-established OppenheimerFunds and MassM-utual names.
Oppenheimer Acquisition conducted months of extensive due diligence into Tremont during the parties’ negotiations. This due diligence included review of materials maintained in Tremont’s data room and focused in large part on Tremont’s business with Madoff and BLMIS, as well as Madoffs investment strategy and the overall nature of BLMIS’s operations. The data room housed an extensive group of materials including legal contracts, corporate documents, regulatory filings, audited and unaudited financial statements, and tax returns. On October 1, 2001, the acquisition deal closed, making Tremont a wholly-owned, direct subsidiary of Oppenheimer Acquisition and bringing Tremont’s operations, including the Rye Funds, under the MassMutual corporate umbrella. Since that point, MassMutual, Oppenheimer Acquisition, and OppenheimerFunds have been listed as “control persons” of Tremont on Tremont Partners’ Uniform Application for Investment Advisors Registration filed with the SEC.
At and after the time of the acquisition, the companies and/or their affiliates shared a number of senior executives and directors. For example, each member of the restructured board of directors of Tremont Advisers, Inc., had direct ties to MassMutual and/or to an entity affiliated with Oppenheimer Acquisition. In addition, executives at MassMutual Life Insurance and OppenheimerFunds served on Oppenheimer Acquisition’s board of directors, executives of Oppenheimer Acquisition held executive positions with MassMutual Life Insurance and OppenheimerFunds, and certain executives at MassMutual Life Insurance served as board members and/or executives at Mass-Mutual Holding. Further, there were individuals employed by OppenheimerFunds who also served in management positions within Tremont Partners.
According to the Complaint, Tremont and the Rye Funds have been held out as being a part of the MassMutual network of subsidiaries and affiliates since 2001. For example, in MassMutual Life Insurance’s 2002 and 2003 Annual Reports, Tremont’s funds are specifically referenced in connection with OppenheimerFunds’ performance. In its 2005 report, MassMutual Life Insurance listed Trem-ont Capital Management Ltd. (formerly Tremont Advisers, Inc.) as one of its “General Agencies and Other Offices” and. named Tremont Group itself as one of its “General Agencies and Other Offices” in Annual Reports for 2006, 2007, and 2008.
When Tremont’s acquisition was announced, senior executives at both Tremont and OppenheimerF-unds publicly underscored the benefits the companies anticipated from their future relationship. Since then, Oppenheimer entities have been involved with the marketing of Tremont’s capabilities. For instance, there have been jointly-launched new funds with names that reflect the ownership of and connection to Tremont, including the “Oppenheimer Tremont Market Neutral Fund LLC” and the “Oppenheimer Trem-ont Opportunity Fund LLC.” Tremont Partners served as investment adviser and OppenheimerFunds han- *345 died fund distribution. Over the years, that family of joint funds has continued to grow such that, in its Uniform Application for Investment Adviser Registration dated March 31, 2006, Tremont Partners stated that it was the sub-advisor or investment manager for several funds which OppenheimerFunds advised. In addition, the plaintiffs allege, Tremont, with the knowledge and approval of its parent companies, marketed itself as being related to those established companies in order to attract investors to the Rye Funds. For example, following the acquisition, the phrase, “An OppenheimerFunds Company,” began to appear on Tremont’s stationery, publications and marketing materials.
DISCUSSION
Defendants Tremont, the Rye Funds, and Oppenheimer Acquisition each have moved to dismiss the Complaint against them pursuant to Rule 12(b)(2) on the grounds that this Court lacks personal jurisdiction over them.[6] They — together with defendant MassM-utual — have also moved to dismiss the Complaint under Rule 12(b)(6) for several different reasons, each of which will be discussed separately below. Finally, defendant KPMG has moved to dismiss or in the alternative to compel arbitration. This Court deals with the 12(b)(2) motions first, since resolution of those motions may render any other issues moot.
1. Personal Jurisdiction (Tremont and Oppenheimer Acquisition)
Because the Tremont defendants are foreign corporations, personal jurisdiction over them is only permissible where (i) the assertion of jurisdiction is authorized by statute, and (ii) exercise of jurisdiction under state law is consistent with basic due process requirements. See Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 5-6 (1979); Caplan v. Donovan, 450 Mass. 463, 465 (2008). Tremont concedes that this Court has jurisdiction as to those claims made by the plaintiffs who are Massachusetts residents. It argues, however, that those plaintiffs who do not reside in this state cannot show a sufficient nexus between their claims and Tremont’s Massachusetts contacts. In determining whether these plaintiffs have made a sufficient showing, this Court takes as true the allegations of the Complaint, construing them in the light most favorable to the plaintiffs’jurisdictional claim and adding to the mix facts put forward by the defendants to the extent that they are uncontradicted. Massachusetts Sch. of Law at Andover, Inc. v. American Bar Assn., 142 F.3d 26, 34 (1st Cir. 1998). Applying this standard, the Court concludes that it has personal jurisdiction over the claims asserted against Tremont by the nonresident plaintiffs.
The plaintiffs rely on the Massachusetts longarm statute, G.L.c. 223A, §3(a), which permits a court to exercise jurisdiction over any person who transacts business in this Commonwealth, provided that the plaintiffs claim arose from those forum-based contacts. Connecticut Nat’l Bank v. Hoover Treated Wood Prods., Inc., 37 Mass.App.Ct. 231, 233 n.6 (1994). Here, the Complaint adequately alleges that Tremont transacted business in the Commonwealth. Specifically, it states that Tremont approached LongVue, a Massachusetts-based investment advisor, to obtain business from it, solicited meetings with and sent marketing materials to LongVue in repeated efforts to pitch investment opportunities, and sent LongVue frequent reports about the Rye Funds’ performance. The “transacting any business” clause has been construed broadly, Heins v. Wilhelm Loh Wetzlar Optical Mach. GmbH & Co. KG., 26 Mass.App.Ct. 14, 17 (1988), and may be satisfied by purposeful solicitation of business in Massachusetts by a nonresident defendant, e.g., Gunner v. Elmwood Dodge, Inc., 24 Mass.App.Ct. 96, 99-101 (1987). See Tatro v. Manor Care, Inc., 416 Mass. 763, 767-68 (1994). The Complaint alleges facts sufficient to show precisely that.
This Court also concludes that the allegations in the Complaint are sufficient to show that the nonresident plaintiffs’ claims arose from Tremont’s transaction of business in Massachusetts. The Supreme Judicial Court has construed the “arising from” language in subsection 3(a) of the longarm statute to create a “but for" test, which is satisfied if the plaintiffs claim “was made possible by, or lies in the wake of, the transaction of business in the forum State.” Tatro v. Manor Care, Inc., 416 Mass. at 770-71. Here, where apparently all the nonresident plaintiffs invested in the Rye Funds in consultation with LongVue, their claims lie “in the wake of’ Tremont’s transaction of business here: but for the alleged misrepresentations by Tremont and the Rye Funds in their communications with LongVue and in the marketing, due diligence, and fund performance materials that the Tremont defendants sent to LongVue, the nonresident plaintiffs would not have invested in those Funds.[7]
Finally, this Court concludes that the exercise of jurisdiction over Tremont is consistent with due process. Here, the touchstone of the determination is whether the defendant “purposefully established ‘minimum contacts’ in the forum state.” Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985), quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Tatro v. Manor Care, Inc., 416 Mass. at 772. If the plaintiffs claim arises out of the defendant’s contacts within the forum and those contacts consist of acts which suggest that the defendant has purposefully availed itself of the privilege of conducting business in the forum state so as to invoke the benefits and protections of its laws, then the assertion of jurisdiction is constitutional. See Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 457 Mass. 210, 217-18 (2010). Here, the Complaint alleges that Tremont sought to expand the market for the Funds by soliciting clients in Massachusetts, either directly or through a Massachusetts-based in *346 vestment advisory firm. Moreover, these marketing efforts were not isolated or transitory: Tremont reached out from New York to create continuing relationships with clients in Massachusetts through Long-Vue. In this Court’s view, this level of solicitation satisfies due process concerns.
This Court reaches the opposite conclusion, however, with respect to Oppenheimer Acquisition, also a foreign corporation: the plaintiffs have failed to allege facts sufficient to show jurisdiction is either statutorily authorized or constitutionally appropriate, particularly in the face of submissions by the defendant, which reveal the following.[8] Oppenheimer Acquisition is a Delaware corporation with a principal place of business in New York. It is a parent company to two entities: Tremont Group Holdings and OppenheimerFunds. Oppenheimer Acquisition has no offices or employees in Massachusetts, and it holds no licenses here or elsewhere. It does no business in Massachusetts and is not qualified as a foreign corporation in this state. Oppenheimer Acquisition does not rent or own real property in Massachusetts or elsewhere, nor does it have any bank accounts here. It has never promoted, marketed, advertised, or sold any products in this state or elsewhere, nor has it ever directed either of its subsidiaries to do so. Oppenheimer Acquisition has no registered agent in Massachusetts and was not served with the summons or complaint for this action within the Commonwealth. Given this factual constellation, there is no basis to conclude that Oppenheimer Acquisition transacts business in Massachusetts, much less that the plaintiffs’ claims must have arisen from those forum-based contacts.
The plaintiffs offer two theories in support of an assertion of personal jurisdiction over Oppenheimer Acquisition, each of them based on the in-state activities of Tremont.[9] First, the plaintiffs contend that, because Tremont is the wholly owned subsidiary of Oppenheimer Acquisition and the Complaint alleges generally that the latter exercised some control over Tremont, Tremont’s in-state activities should be imputed to Oppenheimer Acquisition for purposes of personal jurisdiction. Under Massachusetts law, however, that is permissible only upon a showing tantamount to what is necessary to pierce the corporate veil: the subsidiary’s activities would be enough to establish jurisdiction over the out of state parent only where there was “significant exercise of control” by the parent over the subsidiary, or where there is a “significant intermingling of officers and directors.” See Kleinerman v. Morse, 26 Mass.App.Ct. 819, 823 (1989) (italics added). Ownership of all the controlling stock is not enough nor is the fact that the two entities have common officers and directors. In the instant case, the plaintiffs have failed to show anything more than a relatively meager involvement by Oppenheimer Acquisition in Tremont’s affairs.
Second, the plaintiffs contend that Tremont’s jurisdictional contacts should be imputed to Oppenheimer Acquisition because of its “controlling person” status over Tremont, including the fact that since 2001, Tremont Partners listed Oppenheimer Acquisition as a “control person” in its SEC filings. Even assuming that a viable claim of “control person” liability has been alleged against Oppenheimer Acquisition, this Court is not persuaded that statutory liability can itself be enough to establish personal jurisdiction. As the majority of state and federal courts have recognized when presented with essentially the same argument as the plaintiffs make here, substantive liability for purposes of the securities law “is not to be conflated with amenability to suit in a particular forum,” AT&T Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 591 (9th Cir. 1996); see, e.g., MFS Series Trust III v. Grainger, 96 P.3d 927, 933-34 (Utah 2004). That is because personal jurisdiction has constitutional dimensions, protecting nonresident defendants from being haled into distant courts even where the legislature has made a determination that they should be held substantively responsible for the activities of their in-state subsidiary. The two inquiries are distinct, such that “control persons” liability under the securities law is simply “not germane to the issue of personal jurisdiction.” See City of Monroe Employees Retirement Sys. v. Bridgestone Corp., 399 F.3d 651, 667-68 (6th Cir. 2005), quoting FDIC v. Milken, 781 F.Sup. 226, 234 (S.D.N.Y. 1991).
2. Standing (Tremont, MassMutual, and KPMG)
In support of their motions under Rule 12(b)(6), Tremont, MassMutual, and KPMG each argues that the plaintiffs lack standing to make certain claims because they are derivative: that is, they are actually claims that belong to the entities of which the plaintiffs are limited partners (the Rye Funds) and cannot be asserted without a demand upon the partnership to bring suit or a showing by the plaintiffs that such demand is excused. In opposition, the plaintiffs maintain that their claims are not derivative. This Court concludes that some of the claims to which the defendant’ motions are addressed are in fact derivative in nature and must be dismissed.
The parties agree that, because the Rye Funds were organized as Delaware partnerships, this Court should apply Delaware law to this issue. The parties further agree that this Court may determine whether the claims here are derivative or direct by answering two questions: 1) who suffered the alleged harm; and 2) who would receive the benefit of any recovery or other remedy? Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033, 1035 (Del. 2004) {Tooley). If the partnership alone suffered the harm for which the plaintiffs seek compensation, then it is the partnership (i.e. the Rye Funds) which is entitled to recover, and the claim is derivative. Conversely, if the *347 plaintiffs suffered some harm independent of any injury to the Rye Funds, then individualized recovery is warranted so the cause of action is direct. Tremont and MassMutual argue that, under the Tooiey analysis, the plaintiffs’ claims alleging breach of fiduciary duly and aiding and abetting breach of fiduciary duty must be dismissed as derivative; KPMG contends that all claims alleged against it should be dismissed as derivative in nature or in the alternative, must be arbitrated.
With respect to the counts asserting claims for breach of fiduciary duty (Count XII) and aiding and abetting breach of fiduciary duty (Counts XV1II-XX), this Court agrees with the defendants that these claims are derivative in nature. As alleged in the Complaint, the plaintiffs’ fiduciary duty claims arise from Tremont’s alleged mismanagement of the Rye Fund partnerships through inadequate due diligence, imprudent investing, and otherwise improper day-today partnership operation. As other courts presented with similar Mad off-related allegations have held, a claim for deficient management or administration of a fund is “a paradigmatic derivative claim” under Delaware law. Saltz v. First Frontier, LP, 782 F.Sup.2d 61, 79 (S.D.N.Y. 2010), quoting Albert v. Alex. Brown Mgt. Servs., Inc., Nos. 762BN, 763BN, 2005 WL 2130607, at *12-13 (Del.Ch. Aug. 16, 2005), and citing Litman v. Prudential-Bache Props., Inc., 611 A.2d 12, 15-16 (Del.Ch. 1992) (holding claim to be derivative where the “gist of plaintiffs’ complaint is that the general partners breached their fiduciary duties by inadequately investigating and monitoring investments and by placing their interests in fees above the interests of the limited partners”); see also Newman v. Family Mgt. Corp., 748 F.Sup.2d 299, 315 (S.D.N.Y. 2010); Stephenson v. Citco Group Ltd.; 700 F.Sup.2d 599, 610 (S.D.N.Y. 2010). The harm alleged by these claims was suffered directly by the Rye Fund partnerships and only indirectly experienced by the limited partners, whose interests declined in value as a result of the damages inflicted on the partnership itself. The Rye Fund partnerships would thus properly receive the benefit of any recovery or other remedy. Without a demand on the partnerships to brings these claims (or a showing that such demand was excused), they must be dismissed.
The plaintiffs argue that these claims may nonetheless be pleaded as direct under the reasoning of Anglo American Securities Fund, L.P. v. S.R. Global International Fund, L.P., 829 A.2d 143, 151 (Del.Ch. 2003) (Anglo American). That case is distinguishable, however. In the Anglo American case, the plaintiffs were former partners, so that treating their claims as derivative would mean that any recovery by the partnership would benefit only those partners who joined the fund after the harm occurred. It would provide no relief to those who were actually harmed by the misconduct. Here, none of the plaintiffs is alleged to be a former partner who would be deprived of any recovery, and there is no possibility of a windfall to partners that join after the harm occurred.
Turning to the other counts asserted in the Complaint against KPMG (which does not limit its argument to the fiduciary duty claims) this Court concludes that they are claims that may be directly prosecuted by the individual plaintiffs. Certain of those claims are for negligence and misrepresentation: specifically, the plaintiffs allege that, as a result of KPMG’s misstatements and professional incompetence, they were induced to invest in the Rye Funds, to stay invested, and in some cases to make additional investments in the Funds. As such, these claims describe individualized harm independent of harm to the partnership, and rest on a duty to each plaintiff that is not merely derivative of KPMG’s fiduciary duties as the Rye Funds’ auditor. This was precisely the conclusion the court reached in Stephenson v. Citco Group Ltd., supra, where the plaintiffs were limited partners in a fund called Greenwood Sentry that invested most of its assets with Madoff. Contrasting the claims of negligence and fraud with those alleging breach of fiduciary duty, the court noted that the former would turn on proof that individual plaintiffs were actually induced at a particular point in time into investing in the fund (or increasing their investment) as a direct result of the auditor’s misrepresentations. It therefore involved a particular subset of the limited partnership and did not involved a harm to the partnership which would affect all of its limited partners in proportion to their ownership interest.
Those claims made against KPMG that seek recovery of losses sustained by the plaintiffs as a result of paying taxes on “phantom income” are also direct and not derivative. These claims rest on the fact that the Rye Funds were pass-through tax entities, so the profits and losses of the Funds were allocated to the individual partners. The plaintiffs allege that, as a result of false information provided to them by KPMG in their Form K-1 tax statements, they each paid taxes on income which did not exist. Because the Rye Funds themselves did not pay taxes, these tax-related losses are necessarily individual. See, e.g., Little v. Cook, 274 Va. 697, 708-12 (2007) (reversing a lower court’s award on “tax damages” claim improperly asserted as a derivative action, since the partnership did not sustain the injury, only the limited partners).
This Court’s conclusion that some of the plaintiffs’ claims against KPMG are direct and not derivative also compels the conclusion that KPMG’s motion to compel arbitration of these claims must be denied. That motion is based on an arbitration clause in the Engagement Agreement between KPMG and the Rye Funds. It is undisputed that this clause applies only to those claims by the Funds’ limited partners which are derivative in nature. In a footnote of its memorandum, KPMG argues that even the plaintiffs’ direct claims fall *348 within the scope of the arbitration clause because they somehow arise from the Engagement Agreement. This Court finds this argument entirely unpersuasive. Nothing suggests that the plaintiffs expressly assented to the Engagement Agreement or its arbitration provision, and none of the claims alleged in the Complaint against KPMG depends on a third-party beneficiary status.
3. Exculpation Clauses (Tremont)
Tremont contends that those claims alleging negligent misrepresentation (Count X) and violation of chapter 93A (Counts XIII and XV) as asserted against Tremont Partners and Tremont Holdings must be dismissed because those entities are protected against liability under the exculpation clause contained in the Limited Partnership Agreement (LPA) for each of the Rye Funds. Section 2.7 of the Rye Prime Fund LPA and section 2.6 of the Rye XL Fund LPA in relevant part each states:
The General Partner and any member, director, officer, employee or agent of the General Partner shall not be liable to any Limited Partner or the Partnership for mistakes of judgment or for action or inaction which said party reasonably believed to be in the best interests of the Partnership . . . Notwithstanding the foregoing, the provisions of this [Section] shall not be construed so as to relieve (or attempt to relieve) the General Partner or any member, director, officer, employee or agent of the General Partner of any liability, to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this [Section] to the fullest extent permitted by law. Notwithstanding the foregoing!,] no person shall be exculpated or exonerated from liability, or indemnified against loss for violation of federal or state securities laws, or for any other intentional or criminal wrongdoing.
According to Tremont, construing these provisions “to fullest extent permitted” by Delaware law requires the plaintiffs to plead particularized facts that demonstrate that the defendants acted with scienter, Wood v. Baum, 953 A.2d 136, 141 (Del. 2008).[10] This Court disagrees.
The degree to which a partnership agreement limits liability depends upon the language used in the agreement’s provisions. See 6 Del.C. 1953, §17-1101; see generally M.I. Lubaroff & P.M. Altman, Delaware Limited Partnerships §11.2.6.2 (2011 supp.). Here, the language in the exculpation provisions does not offer the breadth of protection Tremont claims.
Wood v. Baum, supra, the decision upon which Tremont’s argument relies, involved a materially different exculpation provision. At issue in that case was a broadly-worded operating agreement that exempted the company’s directors from aliliability except in case of “fraudulent or illegal conduct.” 953 A.2d. at 139 & n.l. In such circumstances — where a defendant is exculpated from all liability except for claims that involve demonstrating the defendant’s knowledge of wrongdoing — the court held that a plaintiff must allege scienter. See id. at 141.
In contrast, each LPA exculpates the General Partner (and other parties) from liability for mistakes of judgment or for action or inaction reasonably believed to be in the best interests of the Partnership, to the fullest extent permitted by Delaware law, except in case of intentional or criminal wrongdoing. That language does not offer protection from all liability save that which involves establishing knowledge of wrongdoing; a non-exculpated claim thus need not require proof of scienter.
That this is not a basis to dismiss certain counts at this early stage in the case is underscored by the fact that an exculpatoiy provision in a limited partnership agreement is treated by Delaware courts as an affirmative defense. See, e.g., In re Nantucket Island Assocs. Ltd. Partnership Unitholders Litig., No. 17379 NC, 2002 WL 31926614, at *2 & n.3 (Del.Ch., Dec. 16, 2002), citing Emerald Partners v. Berlin, 787 A.2d 85, 91-92 (Del. 2001); Paige Capital Mgt., LLC v. Lerner Master Fund, LLC, No. 5502BCS, 2011 WL 3505355, at *33 (Del.Ch., Aug. 8, 2011). That does not mean that a defendant must ultimately disprove the plaintiffs’ claims. On a motion to dismiss brought under Rule 12(b)(6), however, the court must be convinced that the complaint contains no facts that cast any doubt on the defendant’s entitlement to this affirmative defense. This Court cannot say at this point that there is no doubt but that the exculpation clauses apply.
4. Fraud in the Inducement (Tremont and KPMG)
Count VIII of the Complaint alleges fraud in the inducement against Tremont and the Rye Funds, and Count IX of the Complaint alleges fraud in the inducement against KPMG. Each of those defendants argues that, as a matter of New York substantive law, the facts as alleged in the Complaint do not support a plausible claim for relief.[11] In particular, Tremont and the Funds argue that the Complaint does not identify material misstatements on which the plaintiffs reasonably relied and that it fails to allege sufficiently the element of scienter. KPMG argues that the plaintiffs fail to allege facts showing that the accounting firm knew that its representations were false or that it intended to deceive the plaintiffs. None of these arguments is persuasive.
Tremont first argues that the plaintiffs’ reliance upon the various misrepresentations identified in the Complaint was unreasonable as a matter of law. It notes that each plaintiff executed a Subscription Agreement before purchasing a limited partnership interest in one of the Rye Funds and in so doing, agreed that the “Subscriber has relied solely upon the [PPM], the [LPA], and independent investigations made *349 by the Subscriber. . .’’In addition, Tremont points out that each Rye Fund PPM stated: “NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATIONS OR PROVIDE ANY INFORMATION WITH RESPECT TO THE INTERESTS EXCEPT SUCH INFORMATION AS IS CONTAINED IN THIS MEMORANDUM” (capitalization in original). But the Subscription Agreement expressly permitted reliance upon the fruits of “independent investigations” and upon representations made in the PPMs, which (according to the Complaint) the plaintiffs relied upon to their detriment. Whether this reliance was reasonable or justified are fact specific questions in any event, and not appropriately determined on a motion to dismiss.[12]
Tremont also argues that, as a matter of fact, none of the representations made in the Rye Funds’ PPMs was false or misleading, much less made with knowledge of their falsity. Although this argument has some appeal when the statements in the PPMs are viewed in isolation, it falters under the indulgent standard governing a Rule 12(b)(6) motion. For example, it could permissibly be inferred from all the facts alleged in the Complaint that Tremont did not “review the confirmations of the Partnership’s trading activity for purposes of tracking the current status of the Partnership’s accounts,” and did not “review the Partnership’s holdings with the Investment Advisor” on a regular basis, as the PPMs stated. As to the element of scienter, intent under New York law can be demonstrated by “recklessness of sufficient degree to create an inference of intent.” Stephenson v. Citco Group Ltd., 700 F.Sup.2d at 619, citing State St. Trust Co. v. Ernst, 278 N.Y. 104, 111 (1938); see also South Cherry St. LLC v. Hennessee Group LLC, 573 F.3d 98, 109 (2d Cir. 2009) (scienter element under similar federal standard). In this case, the plaintiffs allege facts that, assumed true, demonstrate reckless disregard by Tremont for the truth. For example, the Complaint alleges that Trem-ont disregarded obvious warning signs (as described in the Background Section, supra) that Madoff was perpetrating a fraud so as not to jeopardize Tremont’s critical revenue stream.[13] Allegations of similar “red flags” in another Madoff-related case were found sufficient at the pleading stage to establish scienter. See Anwar v. Fairfield Greenwich Ltd., 728 F.Sup.2d at 411.[14]
KPMG makes a similar scienter argument as to the fraud claim against it. Like Tremont’s argument, this argument fails when this Court applies the standard it must under Rule 12(b)(6). The Complaint alleges facts from which it may permissibly be inferred that KPMG represented to the plaintiffs that its audits complied with professional standards knowing that they did not. Specifically, KPMG failed to verify the valuation of the Funds’ assets, failed to note that the Funds essentially had no internal controls to verify the accuracy of the information Madoff and BLMIS reported, and did not obtain the required audit evidence by examining more closely the books and records of BLMIS. Such failings may indeed support a claim for fraud. See, e.g., Houbigant, Inc. v. Deloitte & Touche LLP, 303 A.D.2d 92, 100 (N.Y. 2003); Fidelity & Deposit Co. Md. v. Arthur Andersen & Co., 131 A.D.2d 308 (N.Y. 1987).
5. Negligent Misrepresentation and Professional Malpractice (KPMG)
Count XI of the Complaint alleges negligent misrepresentation against KPMG. Count XXIII alleges the related claim of professional malpractice. As to both, KPMG maintains that the Complaint fails to allege a plausible claim for relief under the applicable law.[15] This Court disagrees.
According to Section 552 of the Second Restatement of Torts, a claim for negligent misrepresentation requires proof (among other things) that the defendant, in the course of its business, supplied false information “for the guidance of others in their business transactions” and that those others relied on that information so as to suffer pecuniary loss. See Cumis Ins. Soc’y, Inc. v. BJ’s Wholesale Club, Inc., 455 Mass. 458, 471-72 (2009). Section 552 limits liability to losses suffered by persons for whose benefit and guidance the information is supplied. See Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 496 (1998). In moving to dismiss this claim, KPMG argues that the Complaint does not allege facts showing that the plaintiffs were part of this limited group. It also contends that the allegations are insufficient to show a causal connection between the losses suffered by the plaintiffs and any misrepresentations by KPMG. Neither argument has merit.
According to the Complaint, each plaintiff as a limited partner in the Rye Funds received an annual report, audited by KPMG, that was specifically addressed to “The Partners” of the respective fund. KPMG knew the identities of those “Partners” because the firm also prepared a Form K-l tax statement for each limited partner’s capital account. Whether New York or Massachusetts law is applied, these allegations provide a basis from which one could infer that the plaintiffs were indeed part of a group for whose benefit and guidance KPMG intended to supply its audit information. See White v. Guarente, 43 N.Y.2d 356, 361-63 (1977) (accountants retained by limited partnership hedge fund may be liable to identifiable group of limited partners); see also, e.g., Ackerman v. Price Waterhouse, 252 A.D.2d 179, 198-99 (N.Y. 1998) (discussing liability of accountants for allegedly negligent tax advice rendered to individual limited partners).
As to the argument on causation, KPMG contends that the plaintiffs’ losses were occasioned by Madoff and BLMIS, not KPMG. This argument misses the mark, however. All of the Rye Funds’ assets were invested with Madoff; KPMG took on the task of auditing the Funds, and allegedly misrepresented to the *350 plaintiffs that the audits complied with generally accepted auditing standards when they did not. The plaintiffs invested in the Funds in reliance upon KPMG’s unqualified audit opinions, to their detriment. Morever, KPMG misrepresented in each annual Form K-l statement that taxable investment income was earned for each plaintiffs capital account when in fact the income was illusory. In short, these allegations show a sufficient causal connection between wrongdoing by KPMG and some harm to the plaintiffs for purposes of Rule 12(b)(6).
KPMG also moves to dismiss Count XXIII alleging the related claim of professional malpractice. Specifically, it argues that such a claim requires a showing that the plaintiffs were in privity with the firm. That position finds no support in either New York law, see, e.g., Caprer v. Nussbaum, 36 A.D.3d 176, 195 (N.Y. 2006), or Massachusetts law, see Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. at 498. KPMG cites no authority to the contrary.
6. Aiding and Abetting Fraud (KPMG and MassMutual)
Count XXII of the Complaint alleges aiding and abetting fraud against KPMG, and Count XXI alleges aiding and abetting fraud against MassMutual. The gist of the allegations contained in both counts is that these defendants had actual or constructive knowledge of the fraudulent representations made by Trem-ont and the Rye Funds and provided substantial assistance to that fraud. This Court concludes that the allegations are insufficient as to MassMutual. Having already concluded that the Complaint states a claim against KPMG for fraud as well as for other claims, this Court sees no reason to dismiss a claim for aiding and abetting fraud at this early stage in the case.
Under Massachusetts law,[16] a defendant may be held liable for aiding and abetting a tort committed by another upon proof (among other things) that the defendant provided “substantial assistance or encouragement to the other party.” Go-Best Assets Ltd. v. Citizens Bank of Mass., 79 Mass.App.Ct. 473, 486 (2011), quoting from Payton v. Abbott Labs, 512 F.Sup. 1031, 1036 (D.Mass. 1981). Here, there is no allegation in the Complaint that MassMutual directly assisted either Tremont or the Rye Funds in the commission of fraud. Rather, the plaintiffs contend that MassMutual is liable because it “controlled and dominated” Oppenheimer Acquisition, which itself aided and abetted the fraud perpetrated against the plaintiffs. There is little in the Complaint to suggest that Oppenheimer Acquisition provided any substantial assistance or encouragement to Tremont or the Rye Funds; indeed, the plaintiffs rely on the same anemic allegations of control and involvement in the affairs of Tremont that they did in making their argument that this Court had personal jurisdiction over Oppenheimer Acquisition. The connection from that corporation to MassMutual Holding and MassMutual Life Insurance is even more remote. Shorn of conclus-ory statements about control, involvement, and oversight, the factual allegations show only common stock ownership and a modest overlap of senior executives and company directors. That is simply not enough.
7. State Securities Law Violations (Tremont, Rye Funds, and MassMutual)
The plaintiffs, residents of the Commonwealth and six other states, assert counts for securities fraud against Tremont, the Rye Funds, and MassM-utual under the laws of Massachusetts, Colorado, Connecticut, Florida, New Mexico, Virginia, and Illinois (Counts I-VII). For each such count, liability for the primary violation is alleged against Tremont and the Funds, and “controlling person” liability is alleged against MassMutual. As to Count V, the plaintiffs do not oppose defendants’ motion to dismiss, since that Count relies on a New Mexico statute that was not in effect until after the time of the alleged transactions. The plaintiffs also concede that Florida law does not permit “controlling person” liability, see, e.g., Dillon v. AXXSYS Int’l, 385 F.Sup.2d 1307, 1311 (M.D.Fla. 2005), so that Count (IV) as asserted against MassMutual should also be dismissed. As to the remaining counts, the defendants make three principal arguments, which this Court addresses in turn.[17]
First, Tremont and the Rye Funds and MassMutual each argues that claims alleged by plaintiff Rachel Seelig for violation of the Illinois securities laws must be dismissed because she failed to provide timely notice to rescind her securities purchases. Under Section 13(B) of Illinois Securities Act, 815 Ill.Comp.Stat. 5/13(B), a plaintiff must give such notice within six months after she has knowledge that the purchase or sale is voidable. 766347 Ontario Ltd. v. Zurich Capital Markets, Inc., 249 F.Sup.2d 974, 988 (N.D.Ill. 2003). This rule is not a statute oflimitations but an equitable rule intended to protect defendants against stale claims. Martin v. Orvis Bros. & Co., 25 Ill.App.3d 238, 246 (1974), citing Gowdy v. Richter, 20 Ill.App.3d 514 (1974) see also Norville v. Alton Bigtop Restaurant Inc., 22 Ill.App.3d 273 (1974). Here, the Complaint fails to allege Seelig’s compliance with this statutory notice. The failure to plead this is enough in and of itself to justify dismissal. See, e.g., Denten v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 887 F.Sup. 176, 180-81 (N.D.Ill. 1995); Kleban v. S.Y.S. Rest. Mgmt., Inc., 912 F.Sup. 361, 369 n.3 (N.D.Ill. 1995); Endo v. Albertine, 812 F.Sup. 1479, 1496 (N.D.Ill. 1993); Wislow v. Wong, 713 F.Sup. 1103, 1107 (N.D.Ill. 1989); cf. Norville v. Alton Bigtop Restaurant, Inc., 22 Ill.App.3d 273, 284 (1974). The plaintiffs make no argument to the contrary.
This Court also agrees with the defendants that the claims alleged by plaintiff Richard Askenazy for violation of the Virginia Securities Act are time-barred. The applicable provision of the Virginia Code, section 13.1- *351 522D, sets out a two-year limitations period, construed to be “an absolute cutoff’ of any claims asserted two years after the securities transaction at issue. Caviness v. Derand Resources Corp., 983 F.2d 1295, 1305-06 (4th Cir. 1993); Goldstein v. Malcolm G. Fries & Assocs., Inc., 72 F.Sup.2d 620, 627 (E.D.Va. 1999). The limitations period cannot be tolled by an absence of knowledge. Caviness v. Derand Resources Corp., 983 F.2d at 1306; Goldstein v. Malcolm G. Fries & Assocs., Inc., 72 F.Sup.2d at 627-28. In this case, there is no dispute that the actions giving rise to Richard Askenazy’s state securities law claim occurred more than two years before the original complaint was filed. That claim is therefore time-barred.
More generally, MassMutual contends that neither MassMutual Holding nor MassMutual Life Insurance can be held liable for any state securities law violation to the extent it is based strictly on controlling person liability. This Court agrees. Each state’s “control person” provision as pleaded in the Complaint is modeled after section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. Section 78t(a); hence, federal decisional law interpreting section 20(a) offer persuasive guidance as to what is required. The plaintiffs apparently agree with Mass-Mutual that the standard for liability is correctly stated by the United States Court of Appeals for the First Circuit, which requires a showing by plaintiff that the defendant in fact controlled the violator. Aldridge v. A.T. Cross Corp., 284 F.3d 72, 85 (1st Cir. 2002). “To meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company. Ibid, (italics added). I conclude that the Complaint fails to allege enough facts to satisfy this standard.
Although the question of control is not ordinarily resolved summarily at the pleading stage, see, e.g., In re Cabletron Systems, Inc., 311 F.3d 11, 40 (1st Cir. 2002), the plaintiffs’ allegations fall well short of showing that either MassMutual Holding or MassMutual Life Insurance exerted actual control over Tremont or the Rye Funds. Here again, the plaintiffs rely on MassMutual’s status as a parent corporation, the listing of MassMutual as a “control person” on Trem-ont Partners’ SEC form, and some overlap of directors between MassMutual, Oppenheimer Acquisition, OppenheimerFunds, and Tremont. At most, these facts show some potential to control Tremont and the Funds, but the potential ability to control is not sufficient: what is required are facts from which it might reasonably be inferred that MassMutual “actively participated in the decision-making processes" of Trem-ont and the Rye Funds. See Aldridge v. A.T. Cross Corp., 284 F.3d at 85. These facts are notably absent from the Complaint, even construing the allegations in favor of the plaintiffs.
8. General Laws c. 93A (Tremont, KPMG and MassMutual)
The Complaint alleges variously in Counts XIII-XVII that each defendant engaged in unfair or deceptive acts or practices in violation of both G.L.c. 93A, §9, and § 11.[18] Most of those claims have sufficient factual support in the Complaint plausibly to suggest entitlement to relief, the numerous arguments made collectively by the defendants notwithstanding. However, two sets of chapter 93A claims may be dismissed as a matter of law at the pleading stage.
The first concerns the chapter 93A counts asserted against MassMutual. The substance of the claims alleged to support of those counts is that MassMutual directly or indirectly controlled, and gave substantial assistance to, the misrepresentations made by Trem-ont and the Rye Funds. As previously explained, such claims are not borne out by the allegations in the Complaint. The plaintiffs have not alleged specific facts from which it may permissibly be inferred that MassMutual meaningfully controlled Tremont and the Rye Funds or assisted the fraud and other underlying conduct alleged against those entities. Where chapter 93A claims are derived solely from the same operative facts as other failed common law and statutory claims, courts refuse to impose c. 93A liabiliiy. See, e.g., Macoviak v. Chase Home Mortg. Corp., 40 Mass.App.Ct. 755, 760 (1996); see also Professional Servs. Group, Inc. v. Rockland, 515 F.Sup.2d 179, 194 (D.Mass. 2007), citing cases; Lily Transp. Corp. v. Royal Inst. Servs., Inc., 64 Mass.App.Ct. 179, 204-05 & n.14 (2005) (Laurence & Green, JJ., concurring in part and dissenting in part), collecting cases. So too here.
The second set encompasses the claims brought under section 9 by the six plaintiffs who, the Complaint fails to allege sent the statutorily-required demand letter.[19] The plaintiffs do not dispute that no demand letter was sent. That pleading omission is “fatal” to their claims. Boston v. Aetna Life Ins. Co., 399 Mass. 569, 574 (1987), citing Spring v. Geriatric Auth. of Holyoke, 394 Mass. 274, 287 (1985), and Slaney v. Westwood Auto, Inc., 366 Mass. 688, 704 (1975).
ORDER
It is therefore ORDERED that Defendant Oppenheimer Acquisition Corp.’s Motion to Dismiss the Second Amended Complaint be ALLOWED; that Defendants Massachusetts Mutual Life Insurance Company and MassMutual Holding LLC’s Motion to Dismiss the Second Amended Complaint be ALLOWED; that The Tremont Defendants’ Motion to Dismiss be ALLOWED IN PART and DENIED IN PART, that the Motion of Defendants Rye Select Broad Market Prime Fund, L.P. and Rye Select Broad Market XL Fund, L.P. to Dismiss Complaint be ALLOWED IN PART and DENIED IN PART, and that KPMG LLP’s Motion to Compel Arbitration and Stay the Action Against It, or, in the *352 Alternative, to Dismiss Counts IX, XI, XVI, XIX, XXII and XXIII of the Second Amended Complaint be ALLOWED IN PART and DENIED IN PART
It is therefore further ORDERED that judgment enter dismissing all counts of the Second Amended Complaint asserted against Oppenheimer Acquisition Corporation, Massachusetts Mutual Life Insurance Company, and MassMutual Holding LLC; that judgment enter dismissing Counts V-VII, XII, XVIII, and XIX of the Second Amended Complaint; and that judgment enter dismissing so much of Counts XIII and XVI of the Second Amended Complaint as allege claims by plaintiffs Kenneth Conway, Chet Opalka, Karen Opalka, Patrick Roche, Bedford Clay LLC, and Ivy Street Investment Co., LLC.

The Complaint itself is extraordinary in its length, totaling 944 pages. Although this Court is tempted to take defendants up on their suggestion to dismiss this case outright because the Complaint does not comply with Rule 8, requiring a “short and. plain statement,” this will only delay the case more.

Throughout the years the plaintiffs invested in the Rye Funds, LongVue’s Chief Investment Officer had numerous conversations with a Tremont representative who stated that Tremont “verified” the trades which Madoff reported against independent market data. At certain times, in response to LongVue’s requests, Tremont provided what it purported to be confirmations of some of Madoff s trades.

For example, in 2000, Credit Suisse warned its clients to pull their investments from Madoff due to their suspicions concerning his operations. In 2003, Société Générale similarly discouraged their clients from investing with Madoff. In 2007, hedge fund investment adviser Aksia LLC gave its clients the same advice.

The Complaint asserts the same counts against Tremont as against the Rye Funds. At least for purposes of the current motions, the Rye Funds have adopted the arguments made by Tremont, and the plaintiffs have submitted identical opposition memoranda, so this Court will not attempt to distinguish between these defendants in this decision.

This Court notes that the plaintiffs did not specifically allege in the Complaint but have only represented in their memorandum that all the nonresident plaintiffs invested through LongVue. Should that representation not be borne out by discovery, the personal jurisdiction question could be ripe for summary adjudication.

In support of its motion to dismiss under Rule 12(b)(2), Oppenheimer Acquisition has submitted the Affidavit of Robert G. Zack, the Vice President, Secretary, and General Counsel of Oppenheimer Acquisition.

In addition to these two theories, the plaintiffs make two other unpersuasive arguments on pages 8-9 of their memorandum. First, they argue that Oppenheimer Acquisition assisted Tremont in marketing the Rye Funds and soliciting investments in Massachusetts, but they fail to cite non-con-clusory factual allegations specific to Oppenheimer Acquisition to support that argument. The plaintiffs similarly fall to support their argument that Oppenheimer Acquisition aided and abetted the misrepresentations alleged to have induced the plaintiffs to invest in the Rye Funds.

Tremont contends that each LPA, in accordance with its choice of law section, should be construed under Delaware law. The plaintiffs do not argue otherwise.

Although the plaintiffs claim that Massachusetts law applies, not New York law, I do not need not to resolve the parties’ choice of law dispute since there is no difference between them that is relevant to the issue before me.

Tremont and the Rye Funds rely on a similar argument in moving to dismiss claims for negligent misrepresentation (Count X), violation of G.L.c. 93A, §§9 and 11, (Counts XIII and XV), and violation of the securities laws of Florida and Illinois (Counts IV and VII). For the same reason that this Court declines to dismiss Count VIII, I decline to dismiss these counts as well.

While a generalized profit motive does not support a strong inference of fraudulent intent, e.g., Chill v. General Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996), the Complaint alleges that the defendants took tens of millions of dollars in management and other fees from the Rye Funds for essentially funneling money into Madoff s operations. Furthermore, the fee structure Madoff used — a “red flag” in itself according to the SEC and others — resulted in his foregoing millions of dollars of fees that he could have received and allowing Tremont Partners to charge those fees instead.

Tremont and the Rye Funds rely on a similar argument in moving to dismiss counts alleging violation of the securities laws of Massachusetts and Colorado (Counts I and II). For the same reasons as outlined above, this Court rejects these arguments, at least at this early stage in the case.

The parties disagree as to whether New York law or Massachusetts law applies to these claims. Any differences between the two jurisdictions are not important to resolution of the issues before me at this point, however.

Although the parties dispute whether the substantive law of New York, Delaware, or Massachusetts applies, the result would be the same regardless.

Tremont and the Rye Funds also recycle their contentions that the plaintiffs have failed adequately to allege reasonable reliance and scienter. Even assuming these are necessary elements of state securities law violations, this Court has already concluded that the Complaint alleges sufficient facts to satisfy Rule 12(b)(6) in the context of discussing other claims against these defendants.

Each plaintiff except for Beggs & Cobb Corporation alleges violations of chapter 93A, §9; Beggs & Cobb Corporation alleges violations of section 11.

Those plaintiffs are Kenneth Conway, Chet Opalka, Karen Opalka, Patrick Roche, Bedford Clay LLC, and Ivy Street Investment Co., LLC.